IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 2, 2020

### IN RE: TUCKER H. ET AL

**Appeal from the Circuit Court for Bradley County**
**No. V-18-546      J. Michael Sharp, Judge**

_____

### No. E2019-01970-COA-R3-PT
_____

This is a termination of parental rights case.  Appellant mother appeals the trial court's termination of her parental rights on the grounds of: (1) abandonment by an incarcerated parent for failure to visit and wanton disregard; (2) failure to substantially comply with the requirements of the parenting plans; and (3) failure to manifest an ability and willingness to assume custody.  Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ANDY D. BENNETT, J., joined.

Bradley N. Wilson, Cleveland, Tennessee, for the appellant, Erika R.[1]

Herbert H. Slatery, III, Attorney General and Reporter, and Erica M. Haber, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. Background

Appellant Erika R. ("Mother") is the biological parent of T.L.H. (d/o/b April 2010) and S.L.K.R. (d/o/b March 2015) (together, the "Children").[2]  Appellee Tennessee

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

[2] The Children have different fathers, whose respective parental rights were terminated by the trial court in its October 8, 2019 order.  Neither father is a party to this appeal.

Department of Children's Services ("DCS") has a lengthy history with Mother and her family. In 2013, when T.L.H. was approximately three years old, his paternal grandmother, Kimberly G. ("Grandmother G,"), obtained legal custody of him. There is indication in the record that the child lived with Grandmother G. prior to her obtaining legal custody; however, it is not clear how long T.L.H. resided with Grandmother G. prior to that time. Nonetheless, in December 2016, Grandmother G. tested positive for methamphetamine, amphetamine, THC, and MDMA. Accordingly, DCS removed the child from Grandmother G.'s home. On January 9, 2017, DCS filed a petition to transfer custody of T.L.H. from Grandmother G. to T.L.H's maternal grandmother, Kimberly R. ("Grandmother R."). The younger child, S.L.K.R., had been living with Grandmother R. since he was two months old. The court ordered that Grandmother G. have only supervised visitation with T.L.H. until she completed a list of court-ordered tasks to address drug and alcohol concerns.

During the time the Children were living with the grandmothers, Mother was in and out of jail. Trial Exhibit 2 is a collection of Mother's arrest and incarceration records dating from February 7, 2016 through the date of the hearing.

On March 31, 2017, DCS received a referral alleging lack of supervision and environmental neglect by Grandmother R. The referral specifically alleged that Grandmother R. was permitting T.L.H. to have unsupervised visits with Grandmother G. DCS's investigation revealed that Grandmother R. had, in fact, permitted Grandmother G. to have unsupervised visits, thus exposing T.L.H. to possible drug use. Accordingly, on April 5, 2017, DCS placed both Children into protective custody; at the time the Children were placed in DCS's custody, Mother could not be located. At trial, Mother explained that, as of April 2017, "I was [] in and out of jail. didn't really have a place to live so I was just kind of wherever. Dealing with a drug addiction. You know, trying to figure things out."

On or about April 25, 2017, the Children's Family Service Worker Samantha Walker ("FSW Walker") made contact and met with Mother to review a permanency plan and a corresponding parents' statement of responsibilities. The initial permanency plan required Mother to complete the following steps before the Children could be returned to her: (1) attend parenting classes and submit a certificate of completion; (2) attend child and family team meetings and court hearings; (3) maintain contact with the family service worker and notify her of any change in circumstance within 24 hours; (4) maintain residential stability for a minimum of six months; (5) provide DCS with proof of legal and verifiable income or proof of disability; (6) provide DCS with a copy of a rental or lease agreement in her own name; (7) provide DCS with a copy of a valid driver's license, proof of car insurance, and registration or a transportation plan; (8) pay child support as ordered; (9) submit to random drug screens; (10) if applicable, ensure that the Children are supervised by a sober appropriate adult; (11) not associate with persons who use or are known to use or abuse illegal substances or prescription

medications; (12) attend and complete an alcohol and drug assessment and follow all recommendations; and (13) sign all releases for DCS. Mother reviewed and signed the statement of responsibilities on April 25, 2017. Mother also reviewed and signed the Criteria and Procedures for Termination of Parental Rights on that date. The permanency plan was updated in March 2018, and Mother reviewed and signed the corresponding statement of responsibilities on April 4, 2018. Mother's responsibilities under the revised plan remained the same.

In April 2017, when the Children were taken into State custody, Mother did not have a place to live. She had not had permanent housing since approximately 2013, when she was evicted from her rental house due to her use of illegal drugs. From the record, Mother has struggled with drug addiction throughout these Children's lives, and her primary drug of choice is methamphetamine.

In August 2017, the Children were placed together in a pre-adoptive foster home with Mr. and Mrs. S., and their son, who was then approximately five years old. Both foster parents are employed. T.L.H. is going to school and doing very well. S.L.K.R. goes to preschool three days per week. Because they are close in age, the Children "mostly do everything together," including playing video games, building Legos and drawing. The Children are bonded with their foster family.

From February 2016 until May 2019, Mother has been in and out of jail more than sixteen times on charges of aggravated burglary, drug possession, aggravated assaults, theft, failure to appear, and probation violations. Largely due to her frequent incarcerations, Mother has been unable to maintain steady employment and has only worked "in between jobs" when she was not in jail. Mother has never paid child support for either child.

The record shows that since August 2017, Mother has visited with the Children only a few times. The last time Mother saw the Children was in October 2017, when she visited with them for approximately 50 to 90 minutes at a McDonald's restaurant play area. Thereafter, Mother canceled an arranged visit with the Children. After October 2017 (with the exception of one 2:00 a.m. phone call to the foster family, where she did not leave a message), Mother has made no attempt to contact the foster family or FSW Walker again, even though she had their contact information.

On October 1, 2018, DCS filed a petitioned to terminate Mother's parental rights in the Circuit Court of Bradley County ("trial court"). DCS alleged grounds of abandonment by an incarcerated parent by failure to visit and wanton disregard; (2) failure to substantially comply with the requirements of the permanency plan; and (3) failure to manifest an ability and willingness to assume custody. The trial court appointed counsel for Mother and a guardian ad litem for each child.

- 3 -

The trial court heard DCS's petition on May 1, 2019. At the time of trial, Mother was incarcerated in the Polk County Jail on aggravated burglary charges and had been incarcerated since April 2018 — approximately six months prior to the date the petition was filed. During the trial, Mother testified that she was going to be released to a halfway house in June 2019, and that she would be held there for one year. Mother testified that after her release from jail, she hoped to find employment and housing, and to begin working toward complying with the permanency plan. She also testified that she would visit with the children "as much as possible, as much as DCS will allow because they'll help with transportation and stuff like that." Mother testified that she completed a 12-step program and obtained her GED while she was incarcerated. At the end of trial, "proof was left open for the parties to provide the court with proposed findings of fact and conclusions of law, as well as other evidence concerning [Mother's] release from jail and her halfway house particulars." Mother was released to a halfway house in June 2019; however, she was arrested again on September 21, 2019 on aggravated assault and probation violation charges. Two weeks later, on October 8, 2019, the trial court entered an order terminating her parental rights on the grounds asserted by DCS in its petition and on the trial court's finding that termination of Mother's parental rights is in the Children's best interests. Mother appeals.

## II. Issues

We state the dispositive issues as follows:

1. Whether there is clear and convincing evidence to support at least one of the grounds relied upon by the trial court to terminate Appellant's parental rights.

2. If so, whether termination of Appellant's parental rights is in the Children's best interests.

## III. Standard of Review

The Tennessee Supreme Court has previously explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect

- 4 -

minors....' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." **Hawk**, 855 S.W.2d at 580 (quoting **In re Hamilton**, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also* **Santosky v. Kramer**, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L. Ed.2d 599 (1982); **In re Angela E**., 303 S.W.3d at 250.

**In re Carrington H.**, 483 S.W.3d 507, 522-23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" **In re Jacobe M.J.**, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting **In re W.B.**, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) the existence of one of the statutory grounds; and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); **In re D.L.B.**, 118 S.W.3d 360, 367 (Tenn. 2003); **In re Valentine**, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. **Santosky**, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c); **In re Valentine**, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." **In re M.J.B**., 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination of parental rights cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); **In re Carrington H**., 483 S.W.3d at 523-24 (citing **In re Bernard T.**, 319 S.W.3d 586, 596 (Tenn. 2010); **In re M.L.P.**, 281 S.W.3d 387, 393 (Tenn. 2009); **In re Adoption of A.M.H**., 215 S.W.3d 793, 809 (Tenn. 2007)). The Tennessee Supreme Court has explained that:

The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. **In re M.L.P.**, 281 S.W.3d at 393 (quoting **In re Adoption of A.M.H.**, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. **In re Angela E**.,

303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

Furthermore, if the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). Therefore, this Court "gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

### V. Grounds for Termination of Parental Rights

Although only one ground must be proven by clear and convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed this Court to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." *In re Angela E.*, 303 S.W.3d 240, 251 n. 14 (Tenn. 2010). Accordingly, we will review all of the grounds relied upon by the trial court in terminating Mother's parental rights.

### A. Abandonment by an Incarcerated Parent

Tennessee Code Annotated section 36-1-113(g) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred . . .

Tenn. Code Ann. § 36-1-113(g)(1). As discussed above, Mother was incarcerated at the time DCS filed its petition to terminate her parental rights. As it relates to incarcerated parents, Tennessee Code Annotated section 36-1-102 defines "abandonment," in relevant part, as follows:

(iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental

rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:

(a) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the parent's or guardian's incarceration;

(b) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child during an aggregation of the first one hundred twenty (120) days of non-incarceration immediately preceding the filing of the action; or

(c) Has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; or

***

(C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child is not a defense to failure to support if no payments were made during the relevant four-month period;

***

(E) For purposes of this subdivision (1), "failed to visit" means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period;

(F) Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child;

Tenn. Code Ann. § 36-1-102(1)(A)(iv).

In its order terminating her parental rights, the trial court found that Mother abandoned the Children both by failure to visit in the four month preceding her

incarceration, and by demonstrating a wanton disregard for the Children's welfare, to-wit:

> The court finds that the Department of Children's Services has proven by clear and convincing evidence that [Mother] has abandoned her children as an incarcerated parent, pursuant to T.C.A. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv),-102 (1)(C) and -102(1)(E).
>
> The court finds that [Mother] was incarcerated during all or the greater part of the four (4) months immediately preceding the filing of this petition. The court finds that prior to [Mother's] incarceration, she had only token visits and she engaged in conduct that the court finds shows a wanton disregard for her children's welfare.
>
> The court finds that the Department of Children's Services filed this petition to terminate [Mother's] parental rights on October 1, 2018. The court finds that in the four months preceding the filing of the State's petition, [Mother] was incarcerated. The court finds that prior to that incarceration, [Mother] willfully failed to visit the children, last having visited one time in October of 2017, and even then for a period of less than one hour at a playground at a McDonald's restaurant. The court finds that [Mother] has demonstrated a wanton disregard for the children's welfare by repeatedly incurring numerous criminal charges and by continued illegal drug use, including but not limited to Methamphetamine and Marijuana.

Prior to 2018, the statutory definition of abandonment placed the burden of proof on the petitioner to show that the parent's failure to visit or failure to support was "willful." However, in 2018, the General Assembly amended the statute to shift the burden of proof to the parent or guardian to show that his or her failure to support or visit was not willful. For cases filed on or after July 1, 2018, Tennessee Code Annotated section 36-1-102(1)(I) now provides that:

> For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure

Tenn. Code Ann. § 36-1-102(1)(I). Here, DCS filed its petition on October 1, 2018; accordingly, Mother has the burden to show that her failure to visit the Children was not willful.

Concerning the concept of willfulness in the context of abandonment for purposes of termination of parental rights, this Court has stated:

- 8 -

In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing. . . .

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d 838, 863-64 (Tenn. Ct. App. Aug. 25, 2005) (internal citations and footnotes omitted). "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment . . . is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. Ct. App. 2013) (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). As previously discussed, this Court reviews questions of law *de novo* with no presumption of correctness. *Id.*

Mother readily testified that she has not visited the Children since October 2017, when she spent approximately 90 minutes with them at a McDonald's playground. As noted above, after October 2017, Mother made no attempts (with the exception of a 2:00 a.m. phone call) to contact the foster parents. When questioned as to why she had not visited the Children, Mother testified:

Well, the last visit that I – I ended up going to jail and then when I got out of jail I didn't have a ride anymore because they impounded my car. And so I didn't have any way. And I had made a visit and then I wasn't able to go to it and I texted the foster mom and told her and then after that -- And I was pregnant too at the time, you know, so I was trying to I guess not -- I didn't want anybody to know I was pregnant because I was worried that the State was going to take the baby.
Q. Because you were using?
A. Yeah.

By her own admission, Mother made the unilateral decision to forego any visitation with the Children based on her fear that her third child would also be removed from her custody due to the fact that she continued to use illegal drugs while the child was in

utero.[3]  Based on her testimony, Mother clearly failed to engage in more than token visitation with the Children and clearly failed to meet her burden to show that her failure to do so was not willful.  Accordingly, we affirm the trial court's termination of her parental rights on the ground of abandonment by an incarcerated parent by failure to visit.

In addition to the ground of abandonment by an incarcerated parent by failure to visit, the trial court also found that Mother abandoned the Children by wanton disregard. Tenn. Code Ann. § 36-1-102(1)(A)(iv).  We note that courts are not limited to the four-month period preceding a parent's incarceration to determine whether the parent has engaged in conduct evidencing a wanton disregard for his or her children's welfare.  *In re F.N.M*., No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *3 (Tenn. Ct. App. Apr. 11, 2016); *see also **Dep't of Children's Servs. v. Hood***, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009) ("parental conduct exhibiting wanton disregard for a child's welfare may occur at any time prior to incarceration and is not limited to acts occurring during the four-month period immediately preceding the parent's incarceration").  However, incarceration itself is not grounds for the termination of a parent's rights, but courts consider the incarceration a "triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child."  ***In re Audrey S.***, 182 S.W.3d at 866.

As set out above, the statute does not define "wanton disregard."  ***In re H.A.L.***, No.  M2005-00045-COA-R3-PT, 2005 WL 954866, at *6 (Tenn. Ct. App. Apr. 25, 2005). Nonetheless, Tennessee courts have held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." ***In re Audrey S.,*** 182 S.W.3d at 867-68.  "Our courts have consistently held that an incarcerated parent who has multiple drug offenses and wastes the opportunity to rehabilitate themselves by continuing to abuse drugs, resulting in revocation of their parole and reincarceration, constitutes abandonment of the child, and demonstrates a wanton disregard for the welfare of the child." ***Dep't of Children's Servs. v. J.M.F.***, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7 (Tenn. Ct. App. Jan. 11, 2005) (citing ***In re C.T.S.***, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004); ***Dep't of Children's Servs. v. J.S.***, No. M2000-03212-COA-R3-JV, 2001 WL 1285894, at *3 (Tenn. Ct. App. Oct. 25, 2001); ***In re C.W.W.***, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000).  Indeed, the enactment of Tenn. Code Ann. § 36-1-102(1)(A)(iv), *supra*, reflects the General Assembly's recognition that "parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and that "[i]ncarceration severely compromises a parent's ability

_____

[3] Mother's third child was, in fact, removed from her custody and placed with a family member. This child is not the subject of the instant appeal.

to perform his or her parental duties." ***In re Audrey S.***, 182 S.W.3d at 866. "The actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." ***In re Anthony R.***, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015).

Here, the record is replete with evidence of Mother's poor decision making. Since 2016, she has been in and out of jail for charges ranging from joyriding and simple possession to aggravated burglary and aggravated assault. From the record, Mother has failed entirely to place the Children's needs before her own. Despite her numerous incarcerations, Mother failed to take the steps necessary to address her drug use and stop her criminal activities. Trial Exhibit 2 is a collection of Mother's arrest and incarceration records. It shows that, at times, Mother was not out of jail for a whole day before she committed another crime, which resulted in more incarceration. Moreover, despite the fact that she was released from jail and transferred to a halfway house in June 2019 — and thus provided with an opportunity to rehabilitate herself — Mother was arrested again in September 2019 on aggravated assault and probation violation charges. It does not escape this Court's notice that the September 2019 arrest took place after the trial but during the period when proof was left open in an effort to allow Mother time to submit additional evidence regarding her release from jail and her residency at a halfway house. Mother's long list of crimes and incarcerations clearly demonstrates a wanton disregard for the welfare of the Children in that Mother's incarcerations have "severely compromise[d] [her] ability to perform . . . her parental duties." ***In re Audrey S.***, 182 S.W.3d at 866. From the totality of the circumstances, there is clear and convincing evidence to support the trial court's termination of Mother's parental rights on the ground of abandonment by an incarcerated parent by wanton disregard for the Children's welfare.

**B. Failure to Substantially Comply with the Requirement of the Permanency Plan**

The trial court found, by clear and convincing evidence, that Mother's parental rights should be terminated on the ground of failure to substantially comply with the requirements of the permanency plan. Tennessee Code Annotated Section 36-1-113(g)(2) provides that a parent's rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan."

"[T]he permanency plans are not simply a series of hoops for the biological parent to jump through in order to have custody of the children returned." ***In re C.S., Jr., et al.***, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006). Rather,

> the requirements of the permanency plan are intended to address the

problems that led to removal; they are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care. This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children.

*Id.* As discussed by this Court in *In re M.J.B.*, 140 S.W.3d 643 (Tenn. Ct. App. 2004):

Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002); *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548.

*Id.* at 656-57. The Tennessee Supreme Court has explained that

[s]ubstantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." Black's Law Dictionary 1428 (6th ed. 1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement.

*In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002).

As discussed above, Mother's requirements under the permanency plans were to: (1) attend parenting classes and submit a certificate of completion; (2) attend child and family team meetings and court hearings; (3) maintain contact with the family service worker and notify her of any change in circumstance within 24 hours; (4) maintain residential stability for a minimum of six months; (5) provide DCS with proof of legal and verifiable income or proof of disability; (6) provide DCS with a copy of a rental or

lease agreement in her own name; (7) provide DCS with a copy of a valid driver's license, proof of car insurance, and registration or a transportation plan; (8) pay child support as ordered; (9) submit to random drug screens; (10) if applicable, ensure that the Children are supervised by a sober appropriate adult; (11) not associate with persons who use or are known to use or abuse illegal substances or prescription medications; (12) attend and complete an alcohol and drug assessment and follow all recommendations; and (13) sign all releases for DCS.

Concerning Mother's failure to substantially comply with the foregoing requirements, in its order terminating her parental rights, the trial court found

> that [Mother] testified that she had completed a 12 step program while she was incarcerated. However, prior to her incarceration, and during periods of other incarceration, the court finds that [Mother] failed to comply with any of the permanency plan requirements, including even minimal steps, such as maintaining contact with the Department. The court finds that [Mother] continued to use illegal drugs and to associate with drug users and/or individuals involved in illegal activities.
> The court finds that [Mother] has failed to maintain employment, either immediately prior to her incarceration, or really at any time during the last 6 years. While the court acknowledges that [Mother] did complete an alcohol and drug assessment prior to incarceration, the court finds that [she] failed to follow through with the recommendations of the alcohol and drug assessment. The court finds that [Mother's] drug abuse is a major concern and barrier to reunification, along with her failure to maintain housing or income stability due to her being repeatedly incarcerated due to her criminal activities. These were statements on the permanency plan that were concerns then, and remain concerns now.

The record supports the trial court's findings. Although Mother testified that she attended a twelve-step program while incarcerated, there is no proof that she has been able to maintain sobriety for any length of time. Because Mother's drug use and accompanying criminal activity are of paramount concern to the safety and welfare of these Children, the lack of proof that Mother has been able to remain sober and arrest free is sufficient proof of her failure to substantially comply with the requirements of the permanency plan, which are reasonable and directly related to addressing the reasons for the Children's removal from Mother's custody. In addition to her failure to address the most pressing issues, Mother also failed to address other requirements such as employment and housing. Her inability to satisfy these requirements is due to her continued drug use and engagement in criminal activity. Mother has failed to avail herself of the resources available to her through DCS and other entities, and she has failed to make any significant changes to her lifestyle despite numerous incarcerations. For these reasons, there is clear and convincing evidence to support the trial court's

- 13 -

termination of Mother's parental rights on the ground of failure to substantially comply with the requirements of the permanency plan.

### C. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility

Tennessee Code Annotated section 36-1-113(g)(14) provides a ground for termination of a parent's parental rights when he or she

> has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground for termination of parental rights was added to the statute effective July 1, 2016. *See* 2016 Tenn. Pub. Acts, c. 919, § 20. Concerning the substantive requirements to meet the burden of proof, in ***In re Maya R.***, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at \*7 (Tenn. Ct. App. Apr. 4, 2018), we explained that, first, the petitioner must prove that the parent has failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." Tenn. Code Ann. § 36-1-113(g)(14). Second, the petitioner must prove that placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child." ***Id.***

Concerning the first prong, i.e., whether the parent has failed to manifest an ability and willingness to personally assume custody and financial responsibility of the Child, there has been some disagreement in this Court regarding the measure of proof required to satisfy this burden. In ***In re Ayden S.***, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at \*7 (Tenn. Ct. App. May 31, 2018), a panel of this Court held:

> As to the first prong [of Tennessee Code Annotated Section 36-1-113(g)(14)], the statute requires the party seeking termination to prove a negative: that the parent failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. Here, despite finding that the parents "ha[d not] failed to manifest a willingness to assume custody" and that the "parents want these children," the juvenile court concluded DCS proved by clear and convincing evidence this ground against both parents. The court based its conclusion on the finding that the parents "d[id not] have the ability" to personally assume custody of the children.

In general, "statutory phrases separated by the word 'and' are usually to be interpreted in the conjunctive." *Stewart v. State*, 33 S.W.3d 785, 792 (Tenn. 2000). In the context of a "negative proof" connected by the word "and," a party "must prove that . . . all" of the listed items were not met. Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 120 (2012).

At oral argument, DCS urged that we interpret the word "and" in the disjunctive so that it only had to prove an inability or unwillingness of the parents to assume custody of the children. Our supreme court has "recognized that the word 'and' can also be construed in the disjunctive where such a construction is necessary to further the intent of the legislature." *Stewart v. State*, 33 S.W.3d at 792. But because "we generally presume that the General Assembly purposefully chooses the words used in statutory language," *id.*; *cf.* Scalia & Garner, *supra*, at 116 ("Under the conjunctive/disjunctive canon, and combines items while or creates alternatives."), and the presumption has not been rebutted, we decline to adopt DCS's interpretation here.

We conclude that Tennessee Code Annotated § 36-1-113(g)(14) could not serve as a basis for terminating Mother's and Father's parental rights. The proof at trial negated a required element of the statutory ground. The juvenile court found: "In this case, these parents definitely want to assume legal and physical custody of the children and are willing to assume financial responsibility for the children."

However, in the subsequent case of *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280 (Tenn. Ct. App. June 20, 2018), a panel of this Court parsed the conjunctive (as opposed to disjunctive) language used in Tennessee Code Annotated section 36-1-113(g)(14) and compared the statutory language to other similar statutes before holding that

[u]pon consideration of the statutory language and the relevant legal authority, we hold that the first prong of Tennessee Code Annotated § 36-1-113(g)(14) requires that the petitioner prove that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child.

*Id.* at \*14. This dispute continues in cases where a parent manifests a willingness to assume custody and financial responsibility but is simply unable to do so; however, this is not such a case. In cases, such as the one at bar, where the parent has manifested

- 15 -

neither a willingness nor an ability to assume custody and responsibility, this Court has upheld termination of the parent's parental rights on this ground. *See, e.g.*, **In re J'Khari F.**, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at *15 (Tenn. Ct. App. Jan. 31, 2019) (noting both **In re Ayden S.** and **In re Amynn K.** but ultimately concluding that DCS presented sufficient evidence that "Mother was not able or willing to assume physical or legal custody of or financial responsibility for the Child"); **In re Colton B.**, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *9-10 (Tenn. Ct. App. Oct. 29, 2018) *perm. app. denied* (Tenn. Jan. 22, 2019) (noting the split in authority but holding that it was unnecessary to choose one approach where the parent had manifested neither an ability nor a willingness to parent the child).

Turning to the second prong of Tennessee Code Annotated section 36-1-113(g)(14), i.e., whether placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child," this Court has explained:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

**In re Virgil W.**, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting **Ray v. Ray**, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

Here, the trial court found that Mother failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the Children and that placing the Children in her legal and physical custody would pose a risk of substantial harm to them, to-wit:

> The court finds that the Department has proven by clear and convincing evidence that the [Mother] failed to assume custody or financial responsibility of both children, pursuant to T.C.A. §§ 36-1-113(g)(14).
> The court finds that [Mother] failed to meet the requirements of manifesting both a willingness and an ability to assume legal and physical custody of both children, and that she has failed to manifest both a willingness and an ability to assume financial responsibility for either child. (See **In re Amynn K**., No. E2017-01866-COA-R3-PT, page 21 (Tenn. App., 2018) []). The court finds that placing either of the children in [Mother's] legal and/or physical custody would pose a risk of substantial

harm to the physical and the psychological and emotional welfare of both children. (See *Id.*)

While the court acknowledges [Mother's] testimony that she is willing to attempt to regain custody of the children, the court is very mindful of the fact that [Mother] has never followed through with taking care of the younger child for most of the entirety of the younger child's life, nor has she followed through with taking care of or seeing to the needs of her older child for more than half of that child's life.

Furthermore, the court finds that [Mother] has no proof or knowledge of whether or not she will remain in custody and/or in a halfway house for one year or more than one year. Furthermore, the court finds that, given [Mother's] ongoing incarceration from 2016 through the present date, and given her ongoing illegal drug use and other illegal activities when she has not been incarcerated, the court finds that it cannot and will not expose these children to the dangers of [Mother's] lifestyle that exists now and prior to her incarceration. The court finds that [Mother] has simply failed to demonstrate an ability or a willingness to assume custody of either of these children. The court further finds that [Mother] has failed to complete a drug treatment program, although she was given every opportunity to do so by the Department. The court finds that [Mother's] lifestyle and ongoing incarceration has severely impacted her ability to maintain residential and financial stability. Furthermore, the court finds that [Mother] has not had stable housing for more than 6 years, nor has she maintained consistent employment for more than 6 years. The court finds that [Mother's] life has been a life of instability, illegal activity, and illegal drug use, for more than 6 years prior to the entry of this order. The court finds that placing either of these children in her care is (a) impossible at this point, but (b) the court finds that placing either child in her custody would pose a very serious and substantial risk of physical, psychological and emotional harm to the children. The court finds, given [Mother's] prior consistent lifestyle, that the court can be no more assured of the children's welfare in her custody today than it was prior to 2016. The court finds [Mother's] lifestyle has been consistently inconsistent as it relates to jobs, housing, drug use, illegal activity, and any form of stability.

For many of the reasons discussed above, there is clear and convincing evidence that Mother has failed to manifest either a willingness or ability to assume legal and physical custody of or financial responsibility for the Children and that placing the Children in her legal and physical custody would pose a risk of substantial harm to them. Between February 2016 and May 2019, Mother has been arrested and incarcerated more than sixteen times. T.L.H., who was eight years old when DCS filed its petition, has not lived with Mother, or really seen her, since he was three years old. S.L.K.R., who was four at the time of the hearing on DCS's petition, has not lived with Mother since 2015,

when he was two months old. Mother testified that she left the children with their grandmothers because she "didn't have anywhere to live" and was not "stable at that point in time. . ." because she "was trying to figure out how to quit using, and . . . work a permanency plan." Yet, during the entire time her Children were living with others, Mother continued to use drugs and to incur multiple arrests. In this regard, Mother's actions speak louder than her testimony. At trial, Mother stated that, when she was released to a halfway house she would visit with the Children "as much as possible, as much as DCS will allow because they'll help with transportation and stuff like that." However, when she was, in fact, released from jail to the halfway house, she made no efforts to see the Children. Rather, she engaged in criminal activity that resulted in further incarceration. Accordingly, we conclude that there is clear and convincing evidence that Mother has failed to manifest either a willingness or ability to assume custody of these Children.

Furthermore, as to the second prong of this ground, given the fact that Mother has failed to make any significant changes to her lifestyle, it is clear that placing the Children in her legal and physical custody would pose a risk of substantial harm to them. Mother is unable to support the Children because she is unable to maintain stable employment. At the time of the hearing, she did not have stable housing and had shown no ability to procure housing. Even after the hearing, Mother engaged in criminal activity that resulted in further incarceration. For these reasons, we affirm the trial court's termination of Mother's parental rights on this ground.

## VI. Best Interests

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). As the Tennessee Supreme Court recently explained:

> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be

- 18 -

resolved to favor the rights and the best interests of the child. . . .” Tenn. Code Ann. § 36-1-101(d)(2017).

*In re Gabriella D*., 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. As is relevant to this appeal, these factors include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has made such an adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

\*\*\*

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support . . . .

Tenn. Code Ann. § 36-1-113(i). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. Aug. 11, 2005), *perm. app. denied* (Tenn. Nov. 21, 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S*.,

- 19 -

182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White v. Moody*, 171 S.W.3d at 194.

In its order terminating her parental rights, the trial court considered the foregoing statutory factors in finding:

> The court finds that the best interest factors shown in numbers 1-4 and 6-9 . . . all weigh heavily in favor of termination with regard to [Mother]. The court finds that [she] has [not] made any change or adjustment, despite the reasonable efforts (including case management and visitation) by the Department, to [her] circumstances. The court finds that [Mother] has [not] maintained any contact with [the] children. The court finds that [Mother] last saw the children in October of 2017. The court finds that [Mother] has little to no bond with the younger child, and the court finds has very little bond if any with the older child. The court finds that [Mother] has not completed a drug treatment program, nor has she demonstrated any measure of any real stability that gives this court any evidence that her physical environment would be safe for these children to return to her now or anytime in the near future. The court finds that [Mother] is currently unable to assume custody, and will continue to be unable to assume custody, for the immediate future, and for a period of time that she cannot determine, nor does the court have any way of determining, based upon the proof before the court. The court finds that [Mother] has presented no evidence to the court that she will have suitable, stable housing at any time, in the immediate future, suitable for these children.

For the reasons discussed in detail above, the record clearly and convincingly supports the trial court's finding that termination of Mother's parental rights is in the Children's best interests. Among other things, Mother has failed to support the Children and has failed to provide suitable housing. She continues to use illegal drugs and continues to engage in criminal activity. In short, despite numerous opportunities and reasonable efforts on the part of DCS, Mother has failed to make such an adjustment of circumstance, conduct, or conditions so as to make it safe and in the Children's best interests to be in her custody at any early date.

Meanwhile, the evidence shows that the Children have thrived in the care of their foster family. They consider the foster parents to be their parents and consider the foster parents' biological son to be their brother. The Children's needs are more than met in their current environment. To remove the Children from the only stable home they have known would likely cause them great distress.

## VII. Conclusion

For the foregoing reasons, we affirm the order of the trial court terminating Appellant's parental rights to the two minor Children. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Erika R. Because Erika R. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE